## Strader's Admrs. v. President and Directors of the Lexington Hydraulic and Manufacturing Co.

(Decided January 31, 1912.)

### Appeal from Fayette Circuit Court.

Master and Servant—Accidental Killing of Trespasser by Servant—Liability of Master.—In an action by the administrators of J. M. Strader, deceased, who was unintentionally killed by an employe of the defendant company, in firing a gun in the direction of a trespasser who was shooting ducks on a lake claimed by appellees, Held, that whether the shot was fired in protection of the master's property, or of the work then on hand, is not the material issue. The company is not chargeable with any putative knowledge of the use of deadly weapons by its employes. It had given no authority for their use, nor can such authority be implied by a single use of a rifle. The evidence does not connect the master's knowledge or authority and the use of deadly weapons in the remotest degree, and the court should have peremptorily instructed the jury to find for the defendant. Neither by direction nor by implication have the plaintiffs shown that the water company authorized the use of a deadly weapon or to kill trespassers, nor have they brought their case within the qualifying principles of an unlawful act done in connection with or resulting from an act lawful or rightful in its inception.

Whole court sitting, Judges Nunn and Carroll dissenting.

KIMBALL & HUNTER, FORMAN & FORMAN for appellants.

STOLL & BUSH, GEO. C. WEBB and HUNT, BULLOCK & HUNT for appellees.

Opinion of the Court by Judge Winn—Affirming.

The appellee, commonly known as the Lexington Water Company, in 1906, had possession either as owner or lessee, of a large body of land near Lexington. On this land it had constructed a number of surface reservoirs of large acreage. The property seems to have been quite attractive to sportsmen, both fishermen and hunters, as well to those who had not as to those who had the right to follow these pleasant recreations there. On January 2nd, 1905, the Water Company leased the sporting privileges for a period of years at an annual rental of one thousand dollars, to the New Ellerslie Fishing Club, an association of Fayette County gentlemen who had joined together for the purpose of enjoying and maintaining the sport on these waters. Section VIII. of the written contract of lease ran thus:

"Second party agrees to provide the necessary number of watchmen to properly police said reservoirs and the land contiguous thereto, and within two hundred feet of high water mark at all points, and to prevent, as far as it lawfully can, all trespassing upon said land and upon the privileges herein granted; and, so far as it lawfully can, prevent hunting and shooting thereon, and second party will, at its own expense, prosecute all trespassers thereon; but it is not the purpose of the Water Company to constitute second party, or any of its officers, agents, members, employes or servants, the agent of first party to do any unlawful act or to lay hands upon or physically eject any person from said premises or otherwise commit an assault upon any person."

It appears from the record that the Water Company had placed in conspicuous places the customary signs against trespassing; and that the Fishing Club likewise had posted in sundry places about the shores of the lake its notices forbidding fishing and hunting.

On March 27th, 1906, during the spring flight of wild fowl toward the north, James M. Strader, a young man, who had at one time furnished minnows to the Fishing Club's Superintendent for its members, and who, therefore, was doubtless familiar with the premises and regulations governing them, drove out with a companion to the edge of the waters of one of the reservoirs. He saw a duck down upon the water, and taking a small-calibred rifle which he had with him, climbed out of the buggy

and started toward the shore of the lake. A little later he was found in a dying condition from a rifle wound entirely through his head from temple to temple. The point where he was found was at an elevation of 6.47 feet above the lake, and some 73 feet from the water's edge along the line traversed by the rifle ball which killed him.

Across the lake, distant some 1718 feet from Strader's position upon the opposite shore of the lake, distant some 315 feet from the water's edge, and on an elevation of 9.97 feet, the appellee company was engaged in building a new pump house. A number of its workmen, and a number of workmen for another concern doing the carpenter work on the new building were present at the pump house. It seems from the uncontradicted testimony that on the morning of this day there had been considerable shooting about the lakes. About one o'clock, just after the workmen at the pump house had had their noon lunch, a number of them were startled by the whistling of a rifle ball overhead coming from Strader's location across the lake. Ben Stewart, an employe of the Water Company, had brought a rifle from his boarding house when he came to work that morning, and placed it inside the pump house. When the shot came overhead, and the workmen were alarmed by it, Stewart took his rifle and fired two shots across the lake in Strader's direction. The first shot struck the water in front of Strader. The second shot struck him, inflicting the wound from which he died a few days later. His brothers qualified as his administrators and brought this action against the Water Company for damages for his death. Upon a trial the jury brought in a verdict for the Water Company, and a judgment was rendered dismissing the petition. From that judgment this appeal is prosecuted

Motions by appellee to strike the bill of evidence from the record, to correct the transcript, and the like, are in the record. The appellants complain that they were denied the right to file an amended petition conforming to the proof, that the court erred in its instructions to the jury, and in excluding competent testimony in their behalf. Because of our conclusion that there was not sufficient testimony to take the case to the jury, these questions need not be considered, save in such in-

cidental way as they may border upon the necessarily somewhat full discussion of the testimony.

So much of the petition as it is necessary to notice charges that one Frank Sutton was an employe, and Superintendent or Assistant Superintendent, in charge of the lands and property of the Water Company; that he or Stewart under his direction ordered Strader, then some 300 yards distant, to cease shooting; that Strader failed to do so; that Stewart, under the immediate order and direction of Sutton, in the line and scope of their employment, for the purpose of protecting the Water Company's property from Strader's trespass and shooting, wrongfully, wilfully and with gross negligence shot toward Strader and struck him with the rifle ball. Upon the trial, on March 16th, 1910, plaintiffs tendered an amendment to the petition filed on March 19th, 1907. This amendment, which was refused by the trial court, differed from the original petition only in that it charged that the shooting by Stewart, under Sutton's order, was to stop the alarm and fear of those at work at the pump house and the consequent interference with the business of the Water Company; while the original charge was that the shooting was to protect the Water Company's property from trespass. Evidently the purpose of the amendment was to argue that Sutton had charge of and the immediate right to protect the furtherance of the work in which his crew was engaged, though he might not have had the right to protect the master's property from trespass. The distinction is fancied rather than real. Whether the shot was fired in protection of the master's property or in protection of the immediate work then in hand is not the material issue. Naturally the mind rebels less at a killing, the inciting motive to which was Strader's endangering the lives of the crew, than at the same killing done under a general plan to protect the master's property from trespass. But though an instinctive sentiment upholds the right of protection of the person, we are not to be misled into assuming that this right of defense of the person of the servant by arms is a right which one acting for the master may exercise without authority. The true issue is whether (conceding that Sutton ordered Stewart to fire the fatal shot) the act was within the scope of the real or apparent authority of Sutton. When we have once fixed this issue clearly in our minds the way is open to a correct decision of this case.

There is testimony in the record of a clear and unequivocal nature that Sutton ordered Stewart to fire both shots. There is testimony in the record in direct contradiction of his having given such an order. It is unnecessary for us to weigh this testimony. The record and principles applicable will be discussed upon the theory most favorable to appellants, that Sutton gave the order. Had he the real or apparent authority to give it?

The first phase of this inquiry presents but little difficulty. There was no written contract between Sutton and the Water Company, nor did the minute books of the company contain any reference to Sutton until after Strader's death. On June 26th, 1905, the year before his death, the office of General Manager of the Water Company was created, the preamble reciting that a defect in its organization was the lack of a common directing head of all branches. To this office one H. K. Bell was elected on the day of its creation, "to have general charge of the business of the company, subject to the orders of the Board of Directors, as given to him in detail by the President." Mr. Bell discharged the duties of this office. Sutton, it seems, during the absence of President Stoll of the Water Company, was employed through its Vice President, Ellis, in the summer of 1905. Ellis says that the specific duties of Sutton under his employment were the laying of mains, the doing of work at the reservoir under Mr. Bell, the carrying out of the orders given by Bell, and any other duties that Bell should ask him to perform. He says that he gave Sutton no orders, but always gave them to Bell, his superior. Bell testifies that Sutton was never given any instructions about removing trespassers, or to take any steps in regard to trespassers. Sutton corroborates this testimony. There is no testimony in the record to contradict it. The question of Sutton's direct or express authority to act in the matter of trespassers is therefore eliminated.

The case now narrows down to whether the court found in the record sufficient testimony of customary or implied powers in Sutton upon which to permit the jury, the proper trier of the fact, to say whether the removal of trespassers, coupled with the right to use deadly weapons in so doing, was within the apparent scope of his employment, or the line of his duties. Plaintiffs introduced upon the trial witnesses who testified

in substance that they had heard Sutton say he was going to break up the duck-shooting on the lakes; that Sutton ordered Stewart to do the shooting on the morning in question; that he had ordered duck-hunters from the lake; that he gave permission to an employe of the Water Company to shoot ducks while in the company's employ; that he hired hands to work in his crew; that he looked over the lands draining toward the waters of the company, and had removed dead animals and other impure matter; that he directed the placing of poles by the hands building a high voltage electric line for the company; that he gave specific directions to laborers under him; that he threatened trespassing hunters with arrest; that his telephone, kept in his name, was paid for by the company; and that he worked for the company in various ways about its work, machinery and the like. All of this testimony about trespassers is denied by the testimony of Sutton and the company's witnesses. They explain that the care of the drainage lands was done by Sutton under Bell's orders, and not under any general authority; that he hired hands at prices fixed by the company, and under orders; and that his authority was limited by specific instructions from day to day. The plaintiff's testimony was sufficient, in our judgment, to take the case to the jury upon the general question of the authority of Sutton (implied from his general conduct toward the company's affairs, and its opportunity to know, observe, and by implication ratify his conduct) to remove trespassers. But that still is not the real question. The real question is, conceding his general authority in this respect, whether he had the right within this authority to direct the shooting at Strader under the facts proven here. For the sake, therefore, of getting at this narrow, and yet plain and direct question, we may treat the case as if he had a general authority to remove trespassers— the furthermost position claimed by the appellants.

Now let it be borne in mind that the use of deadly weapons by Sutton, or by any representative of the Water Company, first appears in the instant case. Sutton is not shown ever to have had a weapon, either his own or of the company. The weapon used by Stewart was his own; it had been brought by him to the pump-house on the very morning of the day of the shooting. The company, therefore, is not chargeable with any putative knowledge of the use of deadly weapons. Cer-

tainly it had given, so far as the record discloses, no
direct authority for their use; nor can an authority be
implied from this single exercise of the rifle. This is
the vital point in the case. It is solved by the opinion
of this court in the case of Robards v. P. Bannon
Sewer Company, 130 Ky., 380, where, in passing upon
the sufficiency of the petition, it was held that the em-
ployment of a watchman to guard the property of the
defendant did not involve the right to shoot; but that
an amended petition which charged that the watchman
was authorized by the master to use fire-arms when-
ever in his judgment it was necessary, was good. So
here, omitting any consideration of the pleading, the
evidence does not connect the master's knowledge or
authority and the use of deadly weapons, in the re-
motest degree. In the case of C. N. O. & T. P. Railway
Company v. Rue, 142 Ky., 694, the Bannon case's rela-
tion to the point here is thus explained:

"In that case the only question for decision was
whether the petition, to which a demurrer had been
filed, stated a cause of action. It was therein alleged
that a watchman employed by the defendant as a night
guard at its brick manufacturing establishment wrong-
fully and negligently shot and wounded the plaintiff
as he approached the property, mistaking him for a
burglar or other wrong-doer. It was held on appeal
that the petition stated a cause of action and if its
averments were established by proof, the master would
be liable for the injury inflicted; but such liability was
based upon the fact that the watchman, according to
the averments of the petition, was by the terms of his
employment not only vested with full discretion as to
the means to be used in protecting the employer's prop-
erty, but was expressly authorized to use fire-arms in
doing so. Therefore, in shooting and wounding the
plaintiff, the watchman acted in the exercise of a dis-
cretion with which he was clothed and within the scope
of his employment, for which reason the master was
liable for his act, which was an abuse of discretion,
whether committed willfully, negligently or by mistake."

In Belt. Ry. Co. v. Banicki, 102 Ill. App., 642, there
was no evidence of any authority in the watchman to
shoot, or knowledge in the master that the watchman
carried fire-arms. It was held that the employment of
a watchman to keep away trespassers did not involve

an authority to shoot trespassers—that such authority could not be presumed.

This general rule is not without its limitations, based upon allied but dissimilar facts. For instance, in New Ellerslie Fishing Club v. Stewart, 132 Ky., 8, a watchman for the Fishing Club endeavored to eject Stewart, a trespasser, from the master's property. An altercation immediately arose, when the servant stabbed the trespasser. This court permitted a recovery against the Fishing Club because "the assault and battery complained of was merely a continuation" of the effort to remove, remarking that there was no appreciable time between the two acts—the peaceful effort to remove and the altercation and assault. So in Wise v. Covington & Cincinnati Street Railway Company, 91 Ky., 537, the car conductor insulted a passenger on the car, then followed him into the street and beat and abused him. The court allowed a recovery for the latter because the whole was one continuous event, beginning on the car, where the conductor had authority. And so in many other cases it is established that if the servant uses more force than is necessary in ejecting a trespasser, or if he winds up an ejectment peaceably begun by a wanton or vicious act, the master is liable. So here, had Sutton, in an effort to remove Strader, laid violent hands on him, or in endeavoring to remove him, had in an altercation used a weapon upon him, the company might well be liable. In such a supposed state of fact, he would have "started right but ended wrong" within the rule argued for appellants to impose liability. In the case at bar, upon appellants' own theory of the facts (upon which we have been proceeding) Sutton, without direct or implied authority to use a deadly weapon, without the master's knowledge of the presence of one on its property, without any altercation whatsoever with Strader a third of a mile away, ordered the reckless shot toward Strader. The authority must not be supplied when it is wanting. The jury, moved by sympathy for the dead, and condemnation for the living, should not be allowed to write in their verdicts an authority of which the record presents no evidence. The plaintiffs presented no evidence of Sutton's direct, or of circumstances from which might be implied, his authority to use deadly weapons; and the court should have peremptorily instructed the jury to find for the defendant. The appellants, therefore, were

not prejudiced by the court's submission of the case to the jury and the consequent unfavorable verdict of which they complain.

The testimony excluded did not extend or attempt to extend to cover the use of the weapon. Without passing upon its competency to determine Sutton's implied authority to remove trespassers, it suffices to say that its exclusion was not prejudicial; because, admitting the general authority, there is yet no right of recovery for the particular act in using the weapon in this case.

Upon the whole case we find in Judge Cooley's work on Torts (3rd Ed., P. 1016) a statement of the doctrine made with admirable simplicity. He lays as the foundation for the master's liability, the maxim: Qui facit per alium facit per se; which he renders freely as meaning that that which the superior has put the inferior in motion to do, must be regarded as done by the superior himself. Neither by direction nor by implication have the plaintiffs shown that the Water Company put Sutton in motion to use deadly weapons, or to kill trespassers. Nor have they brought their case within the qualifying principle of an unlawful act, done in immediate connection with, or immediately resulting from, an act lawful or rightful in its inception.

The judgment is affirmed.

Whole court sitting. Judges Nunn and Carroll dissenting.