## William Craig's Administratrix v. Kentucky Utilities Company.

## George Craig, By etc. v. Kentucky Utilities Company.

(Decided February 14, 1919.)

### Appeals from Harlan Circuit Court.

1. Evidence—Corporations—Declarations of Agents—Admissibility.—The declarations of agents of a corporation are binding on the corporation only when made in the course of, or in connection with, the performance of their authorized duties.

2. Master and Servant—Dangerous Instrumentality—Electric Wires.—Where linemen are not entrusted with the control and generation of electricity, but are entrusted merely with bundles of wire for use in making repairs, such bundles of wire are not dangerous instrumentalities, within the rule requiring the master to exercise a proper degree of care to guard, control and protect dangerous instrumentalities owned or operated by him, and to respond in damages for an injury caused by improper use of such instrumentalities by a servant, though not then engaged in performing his duties.

3. Principal and Agent—Powers of Agent—Scope of General Authority.—Linemen in the employ of an electric power company, having general powers to repair the line and protect wire entrusted to their care, have no authority to attach bundles of wire to a charged wire in such a way as to make a death trap for those who may attempt to steal the wire or take it away.

J. G. & J. S. FORESTER for appellants.

GORDON & LAURENT, W. F. HALL, N. R. PATTERSON and BERNARD FLEXNER for appellees.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Affirming.

The first suit mentioned in the caption was brought by William Craig's administratrix against the Kentucky Utilities Company to recover damages for his death. The

second suit was brought by George Craig against the same defendant to recover damages for personal injuries. The two suits were tried together and at the conclusion of the evidence for plaintiffs, the jury was peremptorily instructed to find for the defendant. Plaintiffs appeal.

Prior to the accident, the defendant had constructed, and had in operation, a high power transmission line through a section of Harlan county. The transmission line consisted of poles and wires charged with electricity and was constructed on the defendant's right of way which was unenclosed. The poles were from 25 to 40 feet long, and the wires were from 20 to 30 feet above the ground. On the day of the accident, William Craig and George Craig, two brothers, were out on the mountain side digging ginseng. At that time a copper wire, attached to a large rock, was placed around one of the higher power wires. On one side the rock hung down, and on the other side the copper wire was attached to a bale of galvanized wire, which hung within a few inches of the ground. The result was, that the galvanized wire was heavily charged with electricity. Believing that a storm was impending, William and George Craig started towards a large cliff to procure shelter from the rain. While running, William Craig came in contact with the bale of wire and was instantly killed. George ran against him and was so badly injured that he lay on the ground all night and did not recover consciousness until the next morning.

On the day before the accident, George Lee, Charlie Young and Henry Young passed the place where the accident occurred. There they saw two men whom they had seen working on the line before. One was on the pole and the other on the ground. At that time, they were working on the wire that hung down from the high power wire. Charlie Young said, "What are you fixing that for?" alluding to the wire hanging down. In response to this question, they said, "People had been, or some one had been along there meddling with their wire, hanging things on them and rolling their wire off on the mountain side along there and doing them a right smart damage, bothering them a right smart, and the next one that come along meddling with their wire they would find him there; they'd know who he was." While witnesses were there, they did not see the men at work do anything but suspend the copper wire which caused the accident. There was further evidence that the men at

work were named "Adams," and had been working for the company for some time. Another witness testified that he had seen Jim Redmond along the line overseeing the work. Another witness testified that he had a conversation with Redmond, the foreman, in which Redmond stated that someone had been stealing his wire, and that he was going to fix a trap and the next man who laid his hand on it he would catch him. This evidence, however, was excluded.

The declarations of agents of a corporation are binding on the corporation only when made in the course of, or in connection with, the performance of their authorized duties. 1 R. C. L., section 52, p. 512. Here, it does not appear where, or under what circumstances, the alleged declaration of Redmond, the foreman, was made, and in the absence of such a showing we are not prepared to say that the trial court erred in excluding his declaration. But, if we go further and assume that his declaration was admissible, the case presented by the record is this: Redmond was the foreman of the crew. What their duties were does not appear. From the fact that the construction work had been completed and the employes, who attached the wire, were frequently seen at work on the line, we may infer that they were linemen charged with the duty of making such necessary repairs as the foreman Redmond might direct. We may further infer that they were entrusted with bundles of wire for use in making such repairs, and that it was their duty to take care of the wire. Under these circumstances, the rule requiring the master to exercise a proper degree of care to guard, control and protect dangerous instrumentalities owned or operated by him, and to respond in damages for an injury incurred by reason of the improper use of such an instrumentality by a servant, though not then engaged in the performance of his duties, is not applicable. That rule applies only where the agency or instrumentality is dangerous in itself, and not to such agencies or instrumentalities as become dangerous solely from their improper or negligent use. Tyler v. Stephans' Admrx., 163 Ky. 770, 174 S. W. 790. Here the control and generation of electricity were not entrusted to the linemen. They were merely entrusted with bundles of wire to be used in making repairs, and the wire was not inherently dangerous.

It may be conceded, however, that the spring gun doctrine applies. Under this doctrine, the company is

liable even though the Craig boys were trespassers, if, as a matter of fact, the company's employes, in fixing the death trap, were acting within the scope of their employment, and this question in turn depends on whether they were acting with the company's assent, express or implied. No express assent is shown. As before stated, the precise duties of the foreman and the other employes do not appear. To say that the act of the other employes was with the assent of the company because it was authorized by the foreman, is to assume, without proof of the foreman's duties, that he had authority to bind the company. For aught that appears in the record, he had only the authority to supervise the work of the other linemen while engaged in making repairs. It is not even shown that he was charged with the general supervision, control and protection of the company's property. But, admitting that the foreman and the rest of the crew were entrusted with the company's wire, and therefore had the right to protect the wire, the question is, did this duty carry with it implied authority to prepare a death trap for those who attempted to steal or remove the wire? Ordinarily, the master does not invest his employes with authority to kill trespassers in an effort to protect his property and it is doubtful if such authority may ever be implied from mere admissions made by his employes while engaged in the preparation for, or in the performance of, such an act. Indeed, it has been held that the mere employment of a watchman to guard and protect property does not confer authority to shoot persons who may have unlawfully entered on the property. 18 R. C. L., section 265, p. 811; Robards v. P. Bannon Sewer Pipe Co., 130 Ky. 380, 113 S. W. 429, 132 A. S. R. 394, 18 L. R. A. (N. S.) 923. It is only under exceptional circumstances, such as where a railroad watchman has authority to arrest a person, or a watchman for property is furnished with firearms with the right to use them at his discretion, that the employer is held liable for such acts. We applied this rule in the case of Strader's Admrs. v. President and Directors of the Lexington Hydraulic Manufacturing Co., 146 Ky. 580, 142 S. W. 1073, where we held that an agent of a water works company, with general powers to remove trespassers from a fishing and hunting preserve had no authority to shoot them, or to order another to shoot them. But it is insisted that the company's employes were furnished wire, just as the watchmen in the cases referred to were fur-

nished firearms. Manifestly, there is no analogy between the two cases. When a watchman is furnished firearms, he has implied authority to shoot, but when a lineman is furnished wire to be used in repairing property, its use for the purpose of a death trap is entirely foreign to the purposes of the master.

But it is argued that the employes were acting within the scope of their employment because they were serving the company and not themselves. The rule is that the master is not liable for the torts of a servant done while in the performance of the servant's duties, unless the act itself pertains to the service for which he is employed. The mere fact that the act is done by the servant with the intention of serving the master is insufficient to bring it within the scope of his employment. Farber v. Mo. Pac. Ry. Co., 32 Mo. App. 378. If, in this case, we assume that the employes were entrusted with the wire for use in making necessary repairs, and had the right to take care of and protect the wire, it by no means follows that they were actually serving the company because they charged the wire with electricity so that it would kill anyone who came in contact with it. On the contrary, it would appear that they adopted this method rather than go to the trouble of carrying the wire with them, or putting it in some farmhouse or other place of safety. Indeed, their admissions at the time tend to show that the plan which they put into effect was adopted for the purpose of saving themselves from trouble and annoyance, and that they were therefore serving their own convenience rather than the interests of the company.

Upon the whole, we conclude that mere authority to take care of and protect the wire furnished by the company for use in making necessary repairs, did not carry with it implied authority to prepare a death trap for those who might desire to steal the wire or take it away. Were the rule otherwise, then every servant, charged with the general duty of protecting his master's property, would have implied authority to kill every trespasser, either by using firearms, or a spring gun, or other form of death trap, thus making the master liable for every crime which the servant might see fit to commit, just so the servant declared he committed the crime for the purpose of protecting his master's property. The law does not go this far.

What we have said does not conflict with our ruling in the cases of South Covington & Cin. St. Ry. Co. v. Cleveland, 100 S. W. 283; Williams' Admr. v. Southern Ry. Co., 115 Ky. 230, 73 S. W. 780, and Willis v. Maysville & B. S. R. R. Co., 122 Ky. 658, 92 S. W. 604, 13 Ann. Cases, 74. In the first case, the street railroad was held liable for the act of the company's inspector in laying his hands on plaintiff. It was shown to be the duty of the inspector to investigate accidents and ascertain how and to what extent persons were injured. The liability of the company for the act of the inspector was based on the fact that "the inspector was acting in the interest of the company," and in laying his hand upon the person of plaintiff, "he was attempting to ascertain the extent of her injuries for its benefit." In the second case, the railroad company was held liable for the act of its brakeman in pushing a boy off a moving freight car, on the ground that the brakeman had authority to remove trespassers. In the last mentioned case, a boy standing in a public street of Greenup was struck by a piece of ice, kicked by a brakeman from the platform of the caboose of a passing freight train. The evidence showed that it was the duty of the brakeman to keep the caboose in proper order. The court held that he was acting within the scope of his authority in removing the obstruction from the platform, and that plaintiff was entitled to recover.

It follows that plaintiffs were not entitled to recover, and that the court did not err in directing the jury to return a verdict in favor of the defendant.

Judgment affirmed.